IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| **LOA CANTU,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **EP-08-CV-349-KC** |
| | § | |
| **JOHN E. POTTER, POSTMASTER** | § | |
| **GENERAL, UNITED STATES** | § | |
| **POSTAL SERVICE,** | § | |
| | § | |
| **Defendant**. | § | |

## ORDER

On this day, the Court considered Defendant John E. Potter's ("Defendant") Motion for Summary Judgment ("Defendant's Motion") (Doc. No. 24). For reasons discussed below, Defendant's Motion is **GRANTED**.

## I.     BACKGROUND

The following facts are undisputed. Plaintiff Loa Cantu ("Cantu") is a forty-nine-year-old Caucasian woman who resides in El Paso, Texas. Pl.'s Original Compl. ¶¶ 1, 21 ("Compl."); Def.'s Mot. Ex. A 7:2-8:7 ("Cantu Dep.") (Doc. 24-4). Beginning on August 4, 1984, and at all relevant times thereafter, Cantu has been employed by the United States Postal Service ("Postal Service") as a letter carrier. Compl. ¶ 1. She has worked at the Sunrise Postal Substation in El Paso, Texas, since April 24, 1999. *Id.* ¶¶ 1, 6. Approximately twenty (20) years after she began her employment with the Postal Service, Cantu sought medical attention for lower back pain. *Id.* ¶ 7. She was subsequently diagnosed with

1

advanced degenerative changes, with advanced facet arthropathy, first degree spondylolisthesis, and moderate central spinal canal stenosis, between the fourth and fifth lumbar vertebrae; and advanced degenerative changes and degenerative vacuum, with minimal remodeling osteojaphytes, facet arthropathy and with minimal bilateral neural foraminal stenosis, between the fifth lumbar and first sacral vertebrae.

*Id.*

Cantu was also diagnosed with severe spinal canal stenosis.  *Id.*

In April 2005, Cantu underwent back surgery.  *Id.* ¶ 8.  She did not return to work until September 2005.  *Id.* ¶ 9.  In response to the physician's letter that she provided upon her return, the Postal Service offered Cantu a temporary light duty assignment until November 2005.  *Id.* ¶ 10.  Cantu was unable to secure an extension of the assignment because she was unable to obtain medical documentation of her restrictions.  *Id.*  Nevertheless, after November 2005, the Postal Service allowed Cantu to assign two hours of her work to other mail carriers.  *Id.* ¶ 11.  On August 24, 2006, Cantu's physician, Dr. Gregory R. Misenhimer ("Misenhimer"), drafted an evaluation letter which stated that, while Cantu "continues to have some pain and discomfort in her neck" and "has limited range of motion," she "may return to work full and active duty without limitations."  Def.'s Mot. Ex. G ("Aug. 24, 2006, Medical Letter") (Doc. No. 24-5). Despite Cantu's lack of documented medical restrictions, the Postal Service continued to allow her to assign two hours of her work to other mail carriers until on or about April 4, 2007, when Tyrone Taylor ("Taylor") became the manager of the Sunrise Postal Substation.  Compl. ¶¶ 11-12.

According to Cantu, from the time of Taylor's appointment, Taylor began to engage in a pattern of discrimination and harassment against her.  On April 5, 2007, Cantu alleges that Taylor "raised his voice unnecessarily and harshly ordered her not to clock in, after she had

2

already done so." *Id.* ¶ 13.  Cantu had previously been permitted to clock in thirty (30) minutes earlier than other carriers because of her back problems and the high volume of mail for which she was responsible.  *Id.*  Defendant states that Taylor had posted a note on the sign-in clock instructing all employees not to sign in prior to 7:30 a.m. and that Taylor approached Cantu after Taylor had observed her disregard this notice.  Def.'s Proposed Undisputed Facts ¶¶ 33, 35 ("Def.'s Proposed Facts") (Doc No. 24-1).  After confronting her about the notice, Taylor permitted Cantu to begin work rather than making her clock out and wait until 7:30 a.m.  Compl. ¶ 12; Def.'s Proposed Facts ¶ 35.  Later that day, while Cantu was sorting mail for delivery, Taylor told her to "get a move on."  Compl. ¶ 13.  Whereas Cantu claims that he "yelled [this] at her from across the room," Defendant claims that it was simply an instruction.  *See* Compl. ¶ 12; Def.'s Proposed Facts ¶ 37.  When Taylor approached Cantu, the other mail carriers had finished sorting their mail and were leaving the station.  Cantu Dep. 27:1-8.  Cantu was still organizing her mail.  *Id.*  Cantu states that she later submitted a request to speak with a union steward and a request for one hour of overtime compensation, both of which were allegedly "summarily denied" by Taylor.[1]  *Id.*

Despite the initial denial of her request, Cantu was able to meet with union shop steward Eduardo Montana ("Montana"), along with Taylor, on April 11, 2007.  *Id.* ¶ 14.  When the three of them met, Taylor allegedly gave Cantu three choices: complete her daily tasks in the regular time allotted, bid successfully on another route, or find another job.  *Id.*  Taylor also allegedly cautioned Cantu that, if she continued to work overtime, he would take disciplinary action

---

[1]       In her Complaint, Cantu claims that her requests were summarily denied.  Compl. ¶ 13.  However, in her Deposition, she indicates that Taylor never denied a properly submitted request for her to speak with a union steward.  Def.'s Mot. Ex. A 34:10-14 (Doc. No. 24-4) ("Cantu Dep.").

against her.  *Id.*  At that time, Cantu requested that a "route check" be performed to determine whether her workload was too heavy.  *Id.* (citing HANDBOOK M-39, MANAGEMENT OF DELIVERY SERVICES § 271g (Mar. 1998)).[2]  Cantu reiterated this request in writing on or about April 13, 2007.  *Id.* ¶ 16.  A single-day route check was conducted by Cantu's immediate supervisor, Danny Ramirez ("Ramirez").  *Id.* ¶¶ 12, 16.  According to Cantu, the route check was supposed to be conducted over a period of six (6) days, and a grievance on this subject was later sustained in her favor.[3]  *Id.*  Defendant notes that there are two types of route checks, a formal "271-G route check," and a shorter, one-day route check.  Def.'s Proposed Facts ¶¶ 44-45.  Cantu admits that she does not recall whether she specifically requested a formal 271-G route check.  Cantu Dep. 51:3-5.

Cantu alleges that, on April 20, 2007, Ramirez warned her that any overtime work that she performed would be recorded as "penalty overtime."[4]  Compl. ¶ 18.  Ramirez allowed Cantu

---

[2]  Cantu cites to "Postal Service Manual" and to "Postal Manual M39"; however, the official title appears to be "Handbook M-39, Management of Delivery Services."  *See* HANDBOOK M-39, MANAGEMENT OF DELIVERY SERVICES § 271g (Mar. 1998).

[3]  The Court notes that there is some confusion with regard to the route check request.  Cantu's Complaint implies that a grievance was sustained on her behalf because of the Postal Service's failure to conduct the required six-day route check.  *See* Compl. ¶ 16 ("A route check normally takes place over six full days of route delivery . . . and Mr. Taylor had no right to deny the full route check.  A grievance on this subject was eventually sustained in Ms. Cantu's favor."). However, in her Deposition, Cantu states that she submitted a grievance because the Postal Service failed to conduct *any* route check and that the one-day route check was the formal resolution to her grievance.  Cantu Dep. 121:25-122:10 ("Q. You submitted a formal grievance on the route check? A. Yes.  Q. Okay.  And in response, Mr. Taylor went ahead and granted your – the one-day route check?  A. Correct.  Q. Okay.  And that was a formal resolution to your grievance?  A. Yes.").

[4]  By stating that Ramirez "warned her that any time she worked in excess of eight hours would be 'penalty overtime,'" Cantu's Complaint implies that "penalty overtime" penalizes an employee. Compl. ¶ 18.  In her Deposition, however, Cantu acknowledges that "penalty overtime" is overtime that is paid at double the normal rate of pay.  Cantu Dep. 98:14-16.  She further acknowledges that it is called "penalty" overtime is because it is a penalty to the Postal Service and not to the employee.  *Id.* at 98:17-21.

an extra thirty (30) minutes of overtime, but Cantu told him that this was not enough time for her to complete her work.  *Id.*  In response, Ramirez allegedly accused Cantu of malingering.  *Id.*  Later, Cantu approached Montana in the break room.  *Id.* ¶ 20.  Taylor approached Cantu and sternly ordered her back to work.  *Id.*  Cantu responded to Taylor's order by throwing several pieces of mail onto the table and yelling, "Why are you fucking with me?"  *Id.*  Taylor allegedly responded by "cover[ing] the remaining distance between them at top speed, stopping with his face only about six inches from hers, as if he intended to assault her."  *Id.*  He then threatened to suspend her without pay for her use of profanity.  *Id.*  When Cantu asked Taylor why he was targeting her, he told her to get back to work or she would be sent home.  *Id.* ¶ 21.

Shortly thereafter, Montana intervened and suggested that Cantu see a doctor.  *Id.* ¶ 22.  All three agreed, and Cantu saw her doctor later that day.  *Id.*  Cantu was scheduled to work the following day; however, she claims that her doctor diagnosed her with a sinus infection and advised her to take two days off from work.  *Id.*  Cantu had previously scheduled annual leave the following week, and she did not return to work until April 30, 2007.  *Id.* ¶ 23.  Cantu alleges that, because she did not produce her doctor's note until her return on April 30, 2007, Taylor reported her two days of sick leave as unexcused absences.[5]  *Id.*

On May 2, 2007, Cantu was asked to work one hour of overtime on a different route.  *Id.* ¶ 70.  According to Cantu, this temporarily increased Cantu's workload to an extent that her supervisor, Ramirez, "either knew or should have known that she would be physically unable to

---

[5]      Cantu chose not to pursue this matter further with her employer.  Cantu Dep. 131:5-13 ("Q. Is it your testimony that they do not go back and change that to sick leave and pay you for those days?  A. I didn't really care after so many days.  You know, it was two days and I didn't feel it was worth the fight. . . . Q. So you chose not to pursue that?  A. Correct.").

perform." *Id.* ¶ 24.  That day, Cantu did not perform the requested overtime work, nor did she complete her normal delivery work.  *Id.*  Instead, she went to see her doctor.  *Id.*  The facts that led to her doctor's visit are somewhat disputed.  Whereas Defendant alleges that Taylor advised Cantu to unload her truck and to go see her doctor, Def.'s Proposed Facts ¶ 73, Cantu claims that she was distraught and when she told Taylor that she had to go home, he responded "in a loud and angry tone of voice, 'You are not going home.  You will unload your vehicle and you will go to your doctor.'"  Compl. ¶ 24.

On May 3, 2007, Cantu's physician advised that she "be allowed to continue her route at her pace until the route is completed."  *Id.* ¶ 25.  The note reads, in part:

> I believe that [Cantu] should be allowed to continue her route at her pace until the route is completed.  [Cantu] cannot perform her route as fast as she did prior to her back surgery.  [Cantu] is actually doing very well in regard to the back surgery, however, will be somewhat slower.  For this reason, she should be allowed to work her route at her pace.
>
> Ms. Cantu needs as a matter of medical necessity her scheduled days off.  Without her scheduled days off the patient will not be able to function at her optimum.  I believe that the scheduled days off are medically necessary even if there is a holiday during that week.

Def.'s Mot. Ex. J. ("May 3, 2007, Medical Letter") (Doc. No. 24-7).

Cantu admits that the language regarding working on holidays was included in the Medical Letter at her request.  Cantu Dep. 146:18-147:5.  Defendant points out that "[w]hile the note recommends that [Cantu] be allowed to work at her own pace, it does not suggest what a reasonable pace might be" and "[t]here is no mention in the note as to what, if any, limitations [Cantu] may have."  Def.'s Proposed Facts ¶ 78.  Cantu submitted his recommendation when she returned to work on May 7, 2007.  Compl. ¶ 25.

According to Cantu, she, Montana and Taylor met again on May 8, 2007, to discuss the

unexcused absences she received when she was suffering from a sinus infection.  *Id.* ¶ 26.
During their meeting, Taylor mentioned the May 3, 2007, Medical Letter.  *Id.* ¶ 28.  He told
Cantu that he would request a reduction in her workload.  *Id.*  Cantu admits that Taylor submitted
the request the following day; however, she alleges that he did so with the "strong implication
that it should not be granted."  *Id.*

On May 10, 2007, Cantu alleges that she, Montana and Taylor met for a third time.  *Id.* ¶
29.  During their meeting, Taylor allegedly told Cantu that she would not be permitted to "work
at her pace."  *Id.*  Taylor then advised Cantu that she could not return to work until she produced
proper medical documentation identifying her medical restrictions.  Cantu Dep. 112:14-24.  In
response to Taylor's demand, Cantu submitted a follow-up letter from Misenhimer, which stated
that Cantu "ha[d] no restrictions at th[at] time."  Def.'s Mot. Ex. K ("May 14, 2007, Medical
Letter") (Doc. No. 24-7).  The letter further stated that Cantu "can deliver her entire route but
cannot perform continuous dismounted deliveries."  *Id.*  Cantu claims that she felt compelled to
convince her doctor to withdraw her employment restrictions in order to keep her job, and she
claims that her doctor did so reluctantly.  Compl. ¶ 29.

On May 21, 2007, Cantu submitted a request for EEO pre-complaint counseling.  *Id.* ¶ 30.
Less than a month after filing her request, Taylor was reassigned to the Ysleta Postal Station.  *Id.*
Cantu continued to pursue her administrative claims, and on August 21, 2007, she completed an
EEO Investigative Affidavit.  Def.'s Mot. Ex. L ("Investigative Aff.") (Doc. No. 24-7).  Cantu
acknowledges that, since Taylor's departure, the Postal Service has informally permitted her to
"work at her pace" pursuant to her doctor's recommendations.  Compl. ¶ 31.  Most recently, on
May 31, 2008, her doctor requested that she be allowed to work "five days a week and be

allowed 20 to 60 extra minutes as needed to complete her route." *Id.*

On August 9, 2008, Cantu filed a complaint in this Court. *See generally* Compl. She claims to have exhausted all of the administrative remedies available to her, and she claims that this Complaint is filed on or before the ninetieth day following her receipt of the Equal Employment Opportunity Commission's ("EEOC") final decision denying her relief. *Id.* ¶¶ 32-33. In her Complaint, she alleges that the Postal Service discriminated against her on the basis of her disability, race, age and/or sex. *Id.* ¶ 34. She also claims that the Postal Service denied her reasonable accommodation for her disability and subjected her to a hostile work environment. *Id.* ¶ 35. Cantu is seeking formal reasonable accommodation, recovery of four (4) days[6] of paid sick leave wages, and non-pecuniary damages in the amount of $150,000. *Id.* ¶¶ 38-41. She also seeks attorney fees and costs of Court. *Id.* at 40. On November 25, 2009, Defendant filed a motion for summary judgment. Def.'s Mot. Cantu failed to file a response.

## II.    DISCUSSION

### A.    Standard

Summary judgment is required "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) (2007); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006).

---

[6]    In her request for damages, Cantu requests "economic losses resulting from the four days described above which should have been paid sick leave and were instead recorded as unpaid leave." Compl. ¶ 41. Earlier in her Complaint, however, she indicates that she was "docked for unexcused absences for the two days' sick leave the doctor had recommended." *Id.* ¶ 23. It is unclear from Cantu's Complaint how she arrives at the four-day figure. It is possible that she is referring to the four (4) days that elapsed between Taylor's request for medical documentation of her restrictions and the time that Cantu produced the requested documentation. *See id.* ¶ 29. However, as the Court has granted Defendant's Motion, this issue need not be resolved.

The substantive law identifies which facts are material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 189 (5th Cir. 1996).  A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *Ellison*, 85 F.3d at 189.

"[The] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323; *Wallace v. Texas Tech. Univ.*, 80 F.3d 1042, 1046-47 (5th Cir. 1996).  If the moving party meets its initial burden, the nonmoving party "must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e).  The nonmovant's burden may not be satisfied by "conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  *Warfield*, 436 F.3d at 557 (quoting *Freeman v. Texas Dep't of Criminal Justice*, 369 F.3d 854, 860 (5th Cir. 2004)).  Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).  Thus, the ultimate inquiry in a summary judgment motion is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

### B.    Defendant's Motion

In her Complaint, Cantu alleges a number of causes of action, including discrimination on the basis of disability, race, sex, and/or age, failure to reasonably accommodate her disability,

retaliation, and hostile work environment.  *See generally* Compl.  Defendant argues that all of

Cantu's claims fail as a matter of law.  Def.'s Mot. 1.

### 1.      Exhaustion of administrative remedies

As an initial matter, Defendant claims that Cantu has failed to exhaust the administrative

remedies available to her, as required prior to pursuing a Title VII or Rehabilitation Act action in

federal court.  Def.'s Mot. 3.  Specifically, he argues that Cantu failed to exhaust administrative

remedies for her claim of retaliation and for her complaint that she failed to receive the sick-

leave compensation to which she alleges she was entitled.  Def.'s Mot. 2-3.

Title VII makes it unlawful for an employer to retaliate against an employee for making a

charge of discrimination against the employer.  42 U.S.C. § 2000e-3(a).  "As a precondition to

seeking [] judicial relief, however, complaining employees must exhaust their administrative

remedies by filing a charge of discrimination with the EEO division of their agency."  *Pacheco v.*

*Mineta*, 448 F.3d 783, 788 (5th Cir. 2006); *see also Gupta v. East Texas State Univ.*, 654 F.2d

411, 413 (5th Cir. 1981) ("[T]he filing of an administrative complaint is a jurisdictional

prerequisite to bringing suit under Title VII.").  The law does not require a plaintiff to file a

second administrative complaint to exhaust a claim of retaliation stemming from the first

administrative complaint, *Gupta*, 654 F.2d at 414; however, when the alleged retaliation occurs

before a plaintiff has filed an administrative complaint, the plaintiff must exhaust her retaliation

claim prior to seeking relief in federal court.  *See Eberle v. Gonzales*, 240 F. App'x, 622, 628

(5th Cir. 2007).

Cantu alleges that she has "exhausted all of her administrative remedies in a timely

manner."  Compl. ¶ 33.  As evidence rebutting this assertion, Defendant has submitted a copy of

Cantu's Postal Service Form 2565, EO Complaint of Discrimination in the Postal Service.  *See*

Def.'s Mot. Ex. C ("EO Compl.") (Doc. No. 24-5).  Question Fourteen of the EO Complaint asks

a complainant to specify the type(s) of discrimination alleged.  *Id.*  The question lists eight types

of discrimination.[7]  *Id.*  Adjacent to each type of discrimination listed is a box for a complainant

to check, as applicable.  In her EO Complaint, Cantu placed checkmarks in the boxes next to

"race," "sex," "age" and "disability"; however, she neglected to check the box labeled

"retaliation."  *Id.*; Def.'s Mot. 3 (noting that Cantu selected the boxes immediately preceding and

immediately following the box labeled "retaliation").  The conduct of which Cantu complains

allegedly occurred between the time of Taylor's appointment in April 2007, through his

reassignment in June 2007.  Compl. ¶¶ 12, 30.  Therefore, any alleged retaliatory conduct

necessarily occurred prior to the filing of her EO Complaint on July 15, 2007.  For this reason,

Cantu should have exhausted her administrative remedies prior to filing her Title VII Complaint

in this Court.  Cantu has submitted no evidence to rebut this conclusion, and the Court hereby

dismisses her Title VII retaliation claim for failure to exhaust administrative remedies.  *See Ray*

*v. Freeman*, 626 F.2d 439, 442 (5th Cir. 1980) (citing *Brown v. Gen. Servs. Admin.*, 425 U.S.

820, 833 (1976)) ("To permit [a plaintiff] to seek judicial relief without first affording the

federal-agency employer an opportunity to remedy discriminatory practices administratively

would undermine 'the crucial administrative role that each agency together with the Civil Service

Commission was given by Congress in the eradication of employment discrimination.'").

      Defendant also argues that Cantu should have exhausted her administrative remedies

---

[7]      The eight types of discrimination listed are race, color, religion, national origin, sex, age,
retaliation and disability.  Def.'s Mot. Ex. C ("EO Compl.").

prior to filing a complaint for retaliation in violation of the Rehabilitation Act of 1973 ("Rehabilitation Act").  *See* 29 U.S.C. § 794, as amended; *see also Prewitt v. United States Postal Serv.*, 662 F2d 292, 304 (5th Cir. Unit A Nov. 1981) (noting that the 1978 amendments to the Rehabilitation Act are "subject to the same procedural constraints (administrative exhaustion, etc.) set forth in Title VII of the Civil Rights Act").  According to the regulations implementing the Rehabilitation Act, "[p]ersons who believe they have been discriminated against on the basis of race, color, religion, sex, national origin, age, disability, or genetic information must consult a Counselor prior to filing a complaint in order to try to informally resolve the matter."  29 C.F.R. § 1614.105(a).  Such contact must be initiated "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  *Id.* § 1614.105(a)(1).  Defendant claims that Cantu has failed to administratively exhaust this Complaint and that he is entitled to summary judgment on this claim.  Def.'s Mot. 3-4.  However, as Cantu's retaliation claim fails on other grounds, as discussed in section 3.a below, the Court finds it unnecessary to address this issue.

## 2.    Title VII and ADEA discrimination claims

In addition to her retaliation claims, Cantu alleges that the Postal Service discriminated against her on the basis of her race, sex, and/or age.  Compl. ¶ 34.  It is unlawful for an employer to discriminate against an employee with respect to her compensation, terms, conditions, or privileges of employment, because of the individual's color, sex, and/or age.  *See* 42 U.S.C. § 2000e-2(a)(1) (prohibiting employment discrimination on the basis of color and sex); 29 U.S.C. § 623(a)(1) (prohibiting employment discrimination on the basis of age).  A plaintiff alleging discrimination on any one of these grounds may present direct and/or circumstantial evidence to

12

support her claim.  *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 896 (5th Cir. 2002).  When a plaintiff presents only circumstantial evidence of discrimination, the Fifth Circuit employs the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 892 (1973).  *See McCoy*, 492 F.3d at 556; *Sandstad*, 309 F.3d at 897.  Under this framework, a plaintiff must first establish a prima facie case of discrimination, which requires a showing that she "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside [her] protected group or was treated less favorably than other similarly situated employees outside the protected group."  *McCoy*, 492 F.3d at 556 (outlining prima facie case for sex and race discrimination); *Ross v. Univ. of Texas at San Antonio*, 139 F.3d 521, 525 (5th Cir. 1998) (outlining prima facie case for age discrimination).

Once a plaintiff makes out a prima facie case of discrimination, the burden shifts to the employer to come forward with a legitimate, nondiscriminatory reason for the challenged employment action.  *McDonnell Douglas*, 411 U.S. at 802.  If an employer meets this burden, the burden shifts back to the plaintiff who must show that the employer's articulated, nondiscriminatory reason for the challenged employment action is merely pretext for unlawful discrimination.  *Rios v. Rossotti*, 252 F.3d 375, 378 (5th Cir. 2001) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 138-42 (2000)).

The adverse employment actions of which Cantu complains are: 1) that Taylor "raised his voice unnecessarily and harshly ordered her not to clock in, after she had already done so"; 2) that Taylor yelled at her from across the room, "Let's get a move on, Ms. Cantu"; 3) that Taylor

13

denied her requests to speak with a union steward and a request for one hour of overtime compensation; 4) that the Postal Service only completed a one-day route check on her behalf, instead of the required six-day route check; 5) that Ramirez threatened that any time she worked in excess of eight hours would be "penalty overtime"; 6) that Cantu was ordered "in a very harsh and menacing tone" to get back to work when speaking to Montana; 7) that Taylor threatened to suspend her without pay for her use of profanity; 8) that two of her sick days were recorded as unexcused absences; 9) that her workload was temporarily increased to an unmanageable level; and 10) that she was given "no choice" but to induce her doctor to allow her to return to fully duty with no restrictions.  Compl. ¶¶ 10, 13, 16, 18, 20, 23-24.  However, Cantu has not presented evidence that any of the alleged adverse employment actions occurred or that they resulted in a change of her employment status, benefits or responsibilities.  *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) (citing *Banks v. E. Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 575 (5th Cir. 2003) (quoting *Hunt v. Rapides Healthcare Sys., LLC*, 277 F.3d 757, 769 (5th Cir. 2001)) ("[A]n employment action that 'does not affect job duties, compensation, or benefits' is not an adverse employment action.").

Even assuming that some of the above actions qualify as adverse employment actions, Cantu, in failing to respond, has not made any showing that other employees, similarly situated, were treated more favorably than she was treated.  In order to demonstrate that another employee outside the protected class is "similarly situated," Cantu must show that the supposed misconduct of both employees was "nearly identical."  *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 221 (5th Cir. 2001)).  In her Complaint, Cantu does not allege that other employees were treated more

14

favorably.[8]  In fact, she specifically states that she is not aware of any employees of a different

age that were treated differently.  Cantu Dep. 134:23-135:1 ("Q. Okay.  And in regards to

employees of a different age that were treated differently, you're not aware of any?  A. None.").

Because Cantu has failed to establish a prima facie case of discrimination, her claim is dismissed.

Even if Cantu were able to make out a prima facie case of discrimination, she has not

come forth with evidence that Defendant's stated reasons for the alleged adverse employment

---

[8]     In the deposition testimony provided by Defendant, Cantu names several employees whom she
asserts were treated more favorably than she was treated; however, her testimony does not
demonstrate the existence of any genuine issues of material fact warranting the denial of
Defendant's Motion:

> **Q. [Y]ou indicate that Mr. Taylor treated you differently from two dark-
> complected women; is that correct?**
> A. Yes.
> . . .
> **Q.  How did he treat them differently?**
> A.  He never – never said anything about their time that they needed, never
> challenged them on any of their – any time that they requested and I heard
> through the shop steward that they were quite contented with him, but that's –
> mainly when I'm facing my case, I'm doing my work.  I would see, you know,
> little things where they'd be standing close, you know, or talking and you could
> tell that the conversation would be a friendly conversation.  You could see them
> laughing, smiling.  Any dealings that Mr. Taylor had with me were all, "You
> need to get it done in eight hours, Ms. Cantu."  And I was always "Ms. Cantu."  I
> was never "Loa."
> . . .
> **Q.  How is it that you know they did not have to explain themselves to Mr.
> Taylor in regards to overtime?**
> A.  You didn't hear anything.  You didn't hear any – no arguments.  You know,
> if somebody's arguing, you know, you hear that.  But if somebody is saying,
> "Okay.  I need an hour because I have two foot of Advo to deliver," and they
> don't say anything, then, you know, whatever they've asked for has been
> approved.
> **Q.  Are you assuming then that they didn't have problems with Mr. Taylor
> or do you know for a fact that they did not have problems with Mr. Taylor?**
> A.  Well, I didn't know for a fact.  I don't know.
> . . .
> **Q.  Okay.  Do you know how much overtime they worked or whether they
> were able to complete their routes in eight hours?**
> A.  I have no idea.

*See* Cantu Dep. 66:10-72:1; *see also Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) (stating
that unsubstantiated assertions, improbable inferences, and unsupported speculation are
insufficient to defeat a motion for summary judgment).

actions were pretextual.  Defendant claims that it is "the duty of the Station Manager to ensure efficient operation of the station."  Def.'s Mot. 12.  Once appointed to the Sunrise Postal Substation, Defendant claims that Taylor worked to ensure that all employees, including Cantu, completed their duties in the eight-hour daily time period allotted to them.  *Id.*  "Absent appropriate medical documentation, Mr. Taylor could not simply allow [Cantu] to work at her own pace and earn overtime for doing the same job other employees were expected to perform without the benefit of overtime."  *Id.*

Cantu has failed to introduce any evidence that her employer's proffered reason is pretext for unlawful discrimination.  Furthermore, the allegations in her Complaint appear to support Defendant's assertion.  According to her Complaint, when Cantu resumed work following her back surgery, she was given a temporary "light duty" assignment.  Compl. ¶ 10.  This assignment was only terminated because of "communication problems with her doctor" and not because of any alleged wrongdoing by her employer.  *Id.*  Although the August 24, 2006, Medical Letter she provided to her employer indicated that she had no work restrictions, the Postal Service continued to permit her to handle a reduced workload until April 2007.  *Id.* ¶ 12.  When Taylor became the Sunrise Postal Substation manager in April 2007, Cantu's accommodations were temporarily suspended until she provided her employer with medical documentation for her alleged restrictions.  *Id.*  Although her reduced workload was terminated around this time, her new workload complied with the August 24, 2006, Medical Letter.  *See* Aug. 24, 2006, Medical Letter.  In the interim, Cantu requested and was granted a route check.  Compl. ¶ 16.  Although

16

she claims that the route check was conducted in an improper manner,[9] she has not provided any evidence to support this assertion, and Defendant's evidence indicates that Cantu did not specifically request the longer, six-day route check.  Cantu Dep. 121:25-122:10.

When Cantu's immediate supervisor, Ramirez, temporarily increased her workload to an allegedly unmanageable level, Taylor allowed her to leave work to see her doctor.  Compl. ¶ 24.  Cantu returned with a letter from her physician recommending that she "be allowed to continue her route at her pace until the route is completed"; however, Taylor found the letter insufficient and insisted that she provide specific medical documentation for her restrictions.  Cantu Dep. 111:13-112:24 (". . . [Taylor] told me at 5 o'clock in the afternoon that [sic] not to come back to work until I had proper medical documentation.  And I asked him what he wanted and he said, 'I want to know what your restrictions are.'").  The May 14, 2007, Medical Letter that Cantu provided in response to Taylor's request stated that Cantu had no medical restrictions at the time.  *See* May 14, 2007, Medical Letter.  Although she claims that she "had no choice but to go back and induce Dr. Misenhimer to return her to full duty with no restrictions," and that her doctor agreed to draft the letter "reluctantly, and only at Ms. Cantu's request," Compl. ¶ 29, Cantu does not present any evidence to support her assertion.  To the contrary, her doctor indicated that she had no medical restrictions almost one year prior to Taylor's appointment to the Sunrise Postal Substation – well before the alleged inducement began.  Defendant has articulated a legitimate, non-discriminatory reason for any adverse employment action associated with the Postal

---

[9]     Although her grievance concerning the route check may support Cantu's assertion that the route check was conducted improperly, Cantu has not provided the Court with any evidence of the grievance, nor is the shorter route check likely to qualify as an adverse employment action, as it is simply a test to measure an employee's workload.

Service's restrictions on Cantu's working overtime, and Cantu has presented no evidence that the reasons asserted by the Postal Service are pretext for unlawful discrimination.  *See* Def.'s Mot. 11-12.

The remaining adverse employment actions alleged by Cantu are Taylor's denial of her request to speak with a union steward, his threats of suspension in response to her use of profanity, the temporary increase in the workload she received, and Taylor's failure to document her absences as sick leave.  Compl. ¶¶ 13, 20, 23-24.  As for the alleged denial of Cantu's request to speak with a union steward, Cantu's Complaint states that six (6) days after her request, she "was able to meet, as previously requested, with union shop steward Eduardo Montana."  *Id.* ¶ 14.  As Taylor was also present at the meeting, it appears that any alleged denials were short-lived.  *See id.*  Cantu later admitted that Taylor never denied any properly submitted requests to speak with her union supervisor.  Cantu Dep. 34:10-14.

With respect to her threatened suspension, Cantu does not claim that she was suspended, nor does she claim that similarly situated individuals who used profane language when speaking to their supervisors did not face similar consequences.  Nor does Cantu present evidence that a temporary increase in an employee's workload was out of the ordinary and that similarly-situated employees did not face similar increases.  Compl. ¶ 24.  Although Cantu claims that she was on the "no overtime desired" list, she admits that employees on the list may still receive overtime assignments and that her alleged disability did not prevent her from working overtime.  Cantu Dep. 96:12-18, 97:10-12.  Further, Cantu admits that she neither performed the assigned overtime nor completed her regular duties that day.  *Id.* at 105:22-107:10.  Instead, she left work to see her physician.  Compl. ¶ 24.  Once she provided proper medical documentation for her

injuries, along with a recommendation that she not be required to perform additional work, her employer complied with these recommendations. Thus, it does not appear that these incidents qualify as adverse employment actions for purposes of establishing a prima facie case of discrimination, nor do they support a finding that Cantu was treated less favorably than similarly-situated employees outside of her protected class membership.

Lastly, Cantu complains about the two unexcused absences that she claims should have been recorded as sick leave. *Id.* ¶ 23. However, it is unclear from her Complaint how this relates to her discrimination claims. Cantu does not appear to allege that, by failing to accept the physician's letter, she was treated less favorably than other employees. Thus, Cantu has failed to make out a prima facie case for discrimination on the basis of sex, color, and/or age, and she has failed to present any evidence that Defendant's proffered legitimate reasons for the alleged adverse employment actions are pretextual. For these reasons, the Court grants Defendant's Motion for Summary Judgment on Cantu's claims of discrimination on the basis of sex, race and/or age.

### 3.  Rehabilitation Act[10]

---

[10]  Because "[t]he prima facie case of discrimination under the Rehabilitation Act is operationally identical to the test under the [Americans with Disabilities Act of 1990 ("ADA")]," this Order analyzes ADA and Rehabilitation Act cases interchangeably. *See Melton v. Dallas Area Rapid Transit*, 391 F.3d 669, 676 n.8 (5th Cir. 2004); *see also* 29 U.S.C.A. § 794(d) ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. [§] 12201 to 12204 and 12210), as such sections relate to employment."). However, the Court notes that claims against the federal government must be asserted through the Rehabilitation Act and not the ADA. *See Henrickson v. Potter*, 327 F.3d 444, 447 (5th Cir. 2003) (citing 39 U.S.C. § 201) ("Congress established that USPS is part of the federal government" and is thus "excluded from the coverage of the ADA").

In addition to her Title VII and ADEA discrimination claims, Cantu appears to allege that she was discriminated against on the basis of her disability in violation of the Rehabilitation Act. Compl. ¶ 34 (citing 29 U.S.C. § 794). Specifically, she asserts claims for retaliation and failure to provide reasonable accommodation.

### a.      Retaliation

Cantu alleges that the "acts of harassment and discrimination" outlined in her Complaint "would not have occurred but for [her] reasonable requests for accommodation and reasonable opposition to discriminatory practices." *Id.* ¶ 36. "No person shall be subject to retaliation for opposing any practice made unlawful by . . . the Rehabilitation Act or for participating in any stage of administrative or judicial proceedings under those statutes." 29 C.F.R. § 1614.101 (internal citations omitted). To state a prima facie case of retaliation in violation of the Rehabilitation Act, a plaintiff must establish that 1) she engaged in a protected activity; 2) she was subjected to an adverse employment action; and 3) there was a causal connection linking the protected act and the adverse action. *See Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999). Claims of retaliation under the Rehabilitation Act are subject to the *McDonnell Douglas* burden-shifting test. *See Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001), *cert. denied*, 534 U.S. 896 (2001); *Hooven-Lewis v. Caldera*, 249 F.3d 259, 272 (4th Cir. 2001); *Sherman v. Runyon*, 235 F.3d 406, 409 (8th Cir. 2000); *Williams v. Widnall*, 79 F.3d 1003, 1005 n.3 (10th Cir. 1996); *see also Shannon v. Henderson*, No. 01-10346, 2001 WL 1223633, at *3 (5th Cir. Sept. 25, 2001) ("While this court has not explicitly held that [the *McDonnell Douglas* burden-shifting] framework would also be applicable to a retaliation claim brought under the

Rehabilitation Act, both the language of the Act and the findings of our sister circuits indicate that the same framework should be applied to retaliation claims under the Rehabilitation Act."). Thus, once a plaintiff has established a prima facie case, the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment action. *See Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112 (5th Cir. 1998); *Grizzle v. The Travelers Health Network*, 14 F.3d 261 (5th Cir. 1994). If the employer comes forward with such a reason, the plaintiff must provide sufficient evidence to show that the reason is pretext for retaliation.

Even assuming that Cantu were able to establish a prima facie case of retaliation, as noted herein, Defendant has provided a legitimate, non-discriminatory reason for each adverse employment action alleged. *See generally* Def.'s Mot. Cantu has not come forward with any evidence to show that the Defendant's proffered reason is pretext for unlawful retaliation. Therefore, the Court will grant Defendant's Motion with respect to Cantu's retaliation claim.

**b.     Failure to accommodate**

Cantu also alleges that the Postal Service discriminated against her by failing to reasonably accommodate her disability. Compl. ¶ 30.

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).

> The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and

12210), as such sections relate to employment.
*Id.* § 794(d).

Included in the Americans with Disabilities Act of 1990's ("ADA") definition of discrimination is failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A); 29 C.F.R. § 1630.9(a). To make out a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must prove that (1) she is an individual with a disability; (2) who is otherwise qualified; (3) who worked for a program or activity receiving Federal financial assistance; and (4) that she was discriminated against solely by reason of her disability. *Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997) (citing 29 U.S.C. § 794(a)) (internal quotation marks omitted).

In his Motion for Summary Judgment, Defendant claims that Cantu is not a "qualified individual with a disability" for purposes of the Rehabilitation Act. Def.'s Mot. 7-8. Defendant explains that, "[w]hile there is no question Plaintiff had surgery and that the Postal Service provided [her] with a temporary accommodation during her recuperation, the medical documentation and Plaintiff's own words clearly establish that Plaintiff is not a person with a disability." A qualified individual with a disability is one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Included in the ADA's definition of "disability" is "a physical or mental impairment that substantially limits one or more major life activities of such individual." *Id.* § 12102(1)(A). A physical or mental impairment is "any

physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine." 29 C.F.R. § 1630.1(h)(1). To be "substantially limited" means that one is "[u]nable to perform a major life activity that the average person in the general population can perform," or that one is "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." *Id.* §§ 1630.9(j)(1)(ii)-(iii). "[W]alking" qualifies as a "major life activity." *Id.* § 1630.1(i).

In support of his claim that Cantu is not a "qualified individual with a disability," Defendant submits Misenhimer's letter, which states that Cantu "may return to work full and active duty without limitations." *See* August 24, 2006, Medical Letter. According to Defendant, the Postal Service received no medical documentation indicating that reasonable accommodation was needed until May 3, 2007, when Taylor received a letter requesting that Cantu be permitted to "work at her own pace." Def.'s Mot. 8. In response to Taylor's request for specific documentation of Cantu's medical restrictions, Cantu submitted a follow-up letter from her doctor, which reiterated that she had no medical restrictions. Def.'s Mot. 8 (citing May 14, 2007, Medical Letter). In addition, Cantu herself states that, as of August 21, 2007, she had no physical impairments that substantially limited any of her life activities. *See* Def.'s Mot. Ex. L at 80 ("EEO Investigative Aff.") (Doc. No. 24-7). Question six of the EEO Investigative Affidavit asks a complainant, "[d]oes your physical impairment substantially impair[s] any of the

following major life activities (i.e., caring for one's self, performing manual task, walking,

seeing, hearing, speaking, breathing, learning, or working)?  If so, what and how does it affect

you?"  In response, Cantu wrote, "No, as long as I follow doctor's instructions."[11]

Even if Cantu were a qualified individual with a disability, the Postal Service had a right

to request reasonable documentation of her disability.  *See* EEOC "Requesting Reasonable

Accommodation" in Enforcement Guidance (Oct. 17, 2002), *available at* http://

www.eeoc.gov/policy/docs/accommodation.html ("EEOC Guide") ("When the disability and/or

the need for accommodation is not obvious, the employer may ask the individual for reasonable

documentation about his/her disability and functional limitations."); *see also EEOC v. Chevron*

*Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir. 2009) (citing to EEOC Guide as a source for

appropriate procedures for requesting reasonable accommodation).  "Reasonable documentation

means that the employer may require only the documentation that is needed to establish that a

person has an ADA disability, and that the disability necessitates a reasonable accommodation."

EEOC Guide (noting that "[t]he employer is entitled to know that the individual has a covered

disability for which s/he needs a reasonable accommodation.").

> "[I]f an individual provides insufficient documentation in response to the
> employer's initial request, the employer should explain why the documentation is
> insufficient and allow the individual an opportunity to provide the missing
> information in a timely manner.  Documentation is insufficient if it does not
> specify the existence of an ADA disability and explain the need for reasonable
> accommodation."

*Id.*

Given that the most recent medical note on file indicated that Cantu had no work

---

[11]   Although Cantu includes the caveat "as long as I follow doctor's instructions, her most recent
medical documentation at that time was the May 14, 2007, Medical Letter indicating that she had
no work restrictions.  *See* May 14, 2007, Medical Letter.

restrictions, it was not unreasonable for Taylor to require her to complete her work in the time allotted or to provide medical documentation of any alleged restrictions.  In fact, during Cantu's April 11, 2007, meeting with Taylor, Cantu had indicated that she was able to complete her route without any accommodation.  Cantu Dep. 37:3-8 ("Well, I was – it was just – it was about time, you know.  I was feeling better and I knew that it had been about a year and a half that I'd had this help and that I was stronger and I was feeling very confident that I would be able to carry my route completely by myself.").  When Cantu complained about the additional overtime assigned to her, Taylor permitted her to leave work to see her doctor.  Compl. ¶ 24.  When she returned with a letter stating that she should be permitted to "work at her pace" and that she "needs as a matter of medical necessity her scheduled days off . . . . even if there is a holiday during that week," Taylor submitted a request that Cantu be placed on light duty[12] and he requested specific documentation for her restrictions.  *See* May 3, 2007, Medical Letter; Compl. ¶ 28.

Cantu acknowledges that, once she expressed her need for reasonable accommodation, Taylor gave her the option of bidding on another route with a lighter workload.  Compl. ¶ 14. Although Cantu opposed the manner in which this option was presented to her, she admits that she had seniority in the bidding process and that there were other routes available that would require less walking, but that she opted not to bid on another route.  Cantu Dep. 60:10-13, 61:15-16 ("[P]eople had told me I would be good at Coronado because it's mostly mounted . . . . [b]ut I didn't want to drive all over the mountain, you know. . . . Gas prices . . .").  In order to satisfy its duty to reasonably accommodate its employee, the Postal Service was obligated to engage in an

---

[12]     Although Cantu claims that Taylor submitted the request "with a strong implication that it should not be granted," she offers no evidence in support of her claim.  Compl. ¶ 28.

interactive process with Cantu.  *See Chevron Phillips Chem. Co.*, 570 F.3d at 621.  However, the

Postal Service was not obligated to provide Cantu with her preferred form of reasonable

accommodation.  *See EEOC v. Agro Distribution, LLC*,  555 F.3d 462, 471 (5th Cir. 2009) ("The

ADA provides a right to reasonable accommodation, not to the employee's preferred

accommodation."); *Hunt*, 277 F.3d at 771 n.8 ("[T]he focus is on the objective qualities of the

positions, rather than an employee's subjective preference for one position over another.  That

subjective preference, alone, is an insufficient basis for finding an adverse employment action.");

*see also Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999) ("The ADA does not

require an employer to relieve an employee of any essential function of his or her job, modify

those duties, reassign existing employees to perform those jobs, or hire new employees to do

so.").  Thus, the Postal Service cannot be held liable for failing to offer Cantu her preferred form

of reasonable accommodation.

      Not only is the Postal Service not required to offer an employee his or her preferred form

of accommodation, but, in this case, the Postal Service does not appear to have refused to

accommodate Cantu in her chosen manner.  Indeed, it permitted her to work overtime on a daily

basis.  Although Cantu experienced pressure from her supervisors to complete her route in a

timely fashion, she admits that she was always permitted overtime and never received any

disciplinary action for failing to complete her route on time.  Cantu Dep. 65:23-66:9.  She further

acknowledges that "the Postal Service has informally allowed [her] to 'work at her pace,'" in

accordance with her physician's recommendations and that, after receiving documentation

specifically listing her medical restrictions on May 12, 2008, the Postal Service has complied and

continues to comply with all of her medical restrictions.  Compl. ¶¶ 31-32.  For these reasons,

Defendant's Motion for Summary Judgment is granted with respect to Cantu's claim that the Postal Service failed to reasonably accommodate her disability.

### 4. Hostile work environment

Lastly, Cantu appears to state a claim for hostile work environment in violation of Title VII and the Rehabilitation Act.  *See id.* ¶ 36.  To prove that she was subjected to a hostile work environment based on her sex, Cantu must establish the following: (1) that she belonged to a protected class; (2) that she was subjected to unwelcome harassment; (3) the harassment was based on her protected class membership; and (4) the harassment affected a "term, condition, or privilege" of her employment.[13]  *See LeMaire v. Louisiana Dep't of Transp. and Dev.*, 480 F.3d 383, 393 (5th Cir. 2007) (outlining requirements for stating a claim of hostile work environment based on sexual harassment).  To establish a claim for disability-based harassment under the Rehabilitation Act, the prima facie elements are similar; however, for the third element, Cantu must show that the harassment was based *solely* on her disability or disabilities.  *See Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 506 n.8 (5th Cir. 2002).  For either claim, Cantu must "subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable."  *See Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)).

Cantu points to a number of incidents where she believes that she was treated unfairly by her employer; however, she has not come forward with any evidence indicating that these

---

[13]     A fifth element, that "the employer knew or should have known of the harassment and failed to take prompt remedial action" is not required where, as here, the alleged harasser is a supervisor.  *See Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).

interactions were based on her membership in a protected class.  Nor has she provided evidence

to support a finding that her subjective perception of the harassment was objectively reasonable.

*See Gowesky*, 321 F.3d at 509 (quoting *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229,

236 (5th Cir. 2001)) ("The legal standard for workplace harassment in this circuit is . . .  high.

For workplace abuse to rise to the level of an actionable offense the 'disability-based harassment

must be sufficiently pervasive or severe to alter the conditions of employment and create an

abusive working environment.'"); *see also Soledad*, 304 F.3d at 506 (applying the ADA standard

of pervasiveness and severity, as articulated in *Flowers*, to Rehabilitation Act hostile work

environment claim).

Cantu complains that Taylor yelled at her when she was speaking to Montana; however,

she admits that, at the time, she was not performing her duties, and she agreed that, when a

manager sees an employee not performing his or her duties, it is appropriate to instruct the

employee to return to work.  Cantu Dep. 83:17-24.  Cantu further acknowledges that there are

procedures in place when an employee wishes to speak with a union representative.  *Id.*

Employees must obtain prior approval before speaking to a union representative during work

hours.  *Id.* at 119:4-120:12.  Cantu states that Taylor never denied her an opportunity to meet

with a union representative when she complied with the Postal Service's procedures.  *Id.* at

121:10-14.

Although Cantu objects to the stern tone employed by Taylor, this, alone, is not an

actionable complaint under either Title VII or the Rehabilitation Act.  *See Jackson v. City of*

*Killeen*, 654 F.2d 1181, 1186 (5th Cir. 1981) ("Title VII is not a shield against harsh treatment at

the workplace; it protects only in instances of harshness disparately distributed."); *Soledad*, 304

28

F.3d at 506 n.8 (quoting *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998)) ("It is a simple fact that in a workplace, some workers will not get along with one another, and this Court will not elevate a few harsh words or 'cold-shouldering' to the level of an actionable offense."); *Gowesky*, 321 F.3d at 509.  Similarly, the stern tone employed by Taylor when reprimanding Cantu for her use of profanity does not constitute actionable harassment in violation of Title VII or the Rehabilitation Act, as Cantu provides no evidence that his threat was based on her membership in a protected class or that it affected a "term, condition, or privilege" of her employment.

Cantu also claims that she was unfairly assigned additional work despite her documented request for no overtime assignments.  Compl. ¶ 24; Cantu Dep. 99:7-12.  However, she admits that her disability did not prevent her from working overtime and that documented preference did not exempt her from having to perform overtime work should the need arise.  Cantu Dep 97:10-99:25.  When Cantu informed Taylor that she was unable to complete the overtime assignment given to her, he noted that she did not have any documented medical restrictions on file.  *Id.* at 107:6-18.  Cantu, too, admited that she had no restrictions at the time.  *Id.* ("[M]y doctor's note said that 'Mrs. Cantu has no restriction, can carry her route – can carry her route.'  But it lists no restrictions.  I don't have restrictions, per se.  I can make a dismount delivery.  I can do – I can do everything on the route.  I'm just slower.").  Although she claims that "there were other people available" to perform the overtime work, she provides no evidence to support her claim, and she suffered no disciplinary action as a result of her refusal to complete the assignment.  *Id.* at 106:3-11.

Although Cantu may subjectively perceive the alleged harassment as severe or pervasive,

29

she provides no evidence that such a perception is objectively reasonable or that the alleged

harassment was based upon her membership in a protected class.  For this reason, Defendant's

Motion for Summary Judgment is granted with respect to Cantu's hostile work environment

claim.

**III.    CONCLUSION**

For the reasons set forth above, Defendant's Motion for Summary Judgment (Doc. No.

24) is **GRANTED** in its entirety.  Cantu's Complaint is hereby dismissed with prejudice.

The Clerk shall close the case.

**SO ORDERED**.

**SIGNED** on this  day of 2nd April, 2010.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE